OPINION OF THE COURT
Alan LeVine, J.
This is an action for a mandatory injunction wherein the plaintiff, a tenant in a rent-stabilized apartment building which was converted to cooperative ownership in 1981, claims that the defendants deprived him of his exclusive right to purchase at an “insider” price, the shares of stock allocated to his apartment and he now requests the court to enforce this right. This action .was tried by the court without a jury.
The defendant, Plaza 400 Owners Corp., is a cooperative corporation which owns the apartment building. The defendant, East 56th Plaza, Inc., was the sponsor and selling agent of the building and owner of the shares of stock allocated to plaintiff’s apartment. The defendant, Willow *297 ick Management Company of New York, Inc., was the managing agent of the building.
On June 27, 1980, Plaza 400 promulgated an offering plan to convert the building to cooperative ownership. Pursuant to the terms of the plan, a tenant in occupancy such as the plaintiff had an exclusive right to purchase his apartment at an “insider” price for a period of 90 days from the date of presentation of the plan, in this case until December 22, 1980. This is undisputed.
The plan was declared effective on December 1, 1980 (indicating that at least 35% of the tenants in occupancy of the building had agreed to purchase the shares of stock allocated to their respective apartments) and notice thereof was sent to all tenants including the plaintiff. This is undisputed.
A “closing date”, the date set for transfer of the shares of stock and proprietary leases from the sponsor to the purchaser was fixed on December 19,1980 after 5:00 p.m. The closing date was fixed for January 14, 1981. Defendants concede that plaintiff was not given notice that the closing date had been scheduled.
On December 22, 1980, the plaintiff sought to exercise his exclusive right to purchase his apartment. He tendered an executed subscription agreement, a signed financing rider and a down payment check in the amount of $1,000, to the agent of defendant sponsor.
The defendant rejected plaintiff’s tender of $1,000, taking the position that it was no longer acceptable since the closing date had been fixed on December 19, 1980.
It is defendants’ contention that once the closing date had been fixed, the plaintiff was required to tender the subscription agreement and the total purchase price of the apartment rather than merely the $1,000 deposit. Defendants claim that the entire purchase price could have been tendered either (1) all in cash or (2) by way of a cash down payment and a signed rider for the balance to be financed. The total insider purchase price for plaintiff’s apartment was $68,310. Consequently, if plaintiff chose to finance the purchase, the cash down payment required would total $13,310 and the balance to be financed would total $55,000 as set forth in the rider.
*298 The subscription agreement provided in pertinent part:
“3A. Deposit and Balance. Herewith is my check to the order of ‘400 east 56th street earnest money account’, for the amount of the above-stated Deposit. I agree that, if and when the Plan becomes effective as provided in the Plan, I will pay the above-stated Balance within fifteen (15) days after written notice and demand by the Selling Agent. Such notice shall not be sent unless the closing of title to the Property under the Plan has been scheduled to occur within sixty (60) days thereafter. The Balance shall be paid by my delivery to the Selling Agent of my personal certified check, or an official check, drawn on or by a member of the New York Clearing House Association to the order of ‘400 east 56th street earnest money account.’
“The Selling Agent will give me prompt written notice when the Plan either becomes effective or is abandoned.
“Notwithstanding any other provision of the Plan or this Subscription Agreement to the contrary, any portion of the Total Cash Payment to be financed by a bank, trust company or other lending institution may be paid on the Closing Date provided that the Apartment Corporation shall have theretofore been furnished with a copy of a written commitment from a lending institution for the portion of the purchase price being financed and copies of all documents which the lending institution will require the Apartment Corporation to execute. The Apartment Corporation shall not be obligated to execute any such documents that do not conform to the provisions of the proprietary lease.
“3B. Manner of Payment and Balance. If this Subscription Agreement is executed after the Plan has been declared effective and the Closing Date has been fixed, the Total Cash Payment shall be payable in full by my personal certified or official bank check on the execution hereof.”
In determining whether the plaintiff is entitled to the relief he is seeking, the court has reviewed the various statutes applicable to the conversion of residential apartment buildings. Article 23-A of the General Business Law governs the sale of all types of cooperatively owned real *299 estate and requires that a full description of such real estate interests be fully set forth in a detailed offering plan filed with the Attorney-General. The law requires that a prospective purchaser be provided with all the detailed information necessary in order for him to make an informed decision concerning the purchase of shares in a cooperative.
Specifically, the court has reviewed section 352-eeee of the General Business Law and section 61 of the amended Code of the Rent Stabilization Association of New York City, Inc., which govern the conversion of residential apartment buildings in New York City.
These statutes afford specific protection for tenants living in buildings undergoing conversion and require that an offering plan clearly set forth the rights and obligations of purchasers and nonpurchasers.
In the case at bar, the offering plan specifically sets forth a procedure to purchase shares in the cooperative. The plan states: “I. procedure to purchase. Á person desiring to purchase shares of the Apartment Corporation will be required to execute a Subscription Agreement in quadruplicate in the form contained in Part II of this Plan and return it to the Sponsor at 400 East 56th Street, New York, New York 10022, together with a check for the required downpayment of $1000 drawn on a New York City bank to the order of ‘400 east 56th street earnest money account’ ”.
This provision of the plan was amended on October 30, 1980 to provide that a tenant was entitled to submit the down payment and subscription agreement up to and including December 22, 1980. A prospective purchaser having read this section of the plan could reasonably interpret this to mean that in order to accept the offer of the sponsor he was obligated to tender a $1,000 down payment check and an executed subscription agreement on or before December 22, 1980.
The plan makes no mention of any condition or reference to any term of the subscription agreement which would alert the prospective purchaser that prior to the expiration of the exclusive period he would be required to tender the entire purchase price (either all in cash or by way of a cash *300 down payment and a signed rider) in order to accept the sponsor’s offer. A copy of the subscription agreement is annexed at the end of the plan. Paragraph 7B of the subscription agreement provides that conflicts between the agreement and the plan shall be resolved in favor of the plan.
A prospective purchaser having apprised himself of the procedure to purchase in the offering plan might very understandably put the offering plan aside without even looking at the subscription agreement, and circle December 22, 1980 on the calendar as the final dgy he would be entitled to accept the sponsor’s offer to purchase at the insider price. Such purchaser could reasonably and correctly conclude that the applicable statutes and the plan gave him an irrevocable right to purchase his apartment at the insider price for a period of 90 days.
Although a more conscientious individual might consider it less than prudent to wait until the final day to exercise his right, nevertheless under the law a purchaser was entitled to accept the offer on the 90th day.
Defendants cannot and do not dispute plaintiff’s right to wait until the final day to accept the offer. However, defendants argue that the subscription agreement annexed to the plan, by its terms put the plaintiff on notice that the manner of accepting the offer would change once the closing date was scheduled. They further argue that plaintiff was not entitled to notice that the closing date had been scheduled, since he had not yet executed the subscription agreement as of the time of the scheduling of the closing date.
It would seem that defendants argue on the one hand that plaintiff was bound by the terms of the subscription agreement which he had not yet executed but on the other hand, he was not entitled to notice of the closing date since he had not yet become a subscriber.
To adopt the defendants’ argument would be to place a prospective purchaser such as the plaintiff in a “catch 22” position.
Furthermore, it does not seem reasonable to this court that a prospective offeree should be put in the position of *301 having to guess from day to day as to the manner in which he is required to accept an offer.
It is basic contract law that an offer must be definite and certain in order that the offeree can know what performance is required of him. (1 Williston, Contracts [3d ed], §§ 38-48; 1 Corbin, Contracts, §§ 95-100.)
To allow the defendants to alter the manner in which a prospective purchaser such as the plaintiff was required to accept the offer, by conditioning it upon the occurrence of a particular event, without requiring that such purchaser be given reasonable notice of the occurrence would place the purchaser at an unfair disadvantage. (Fleischman v Furgueson, 223 NY 235, 241.)
To hold that a prospective purchaser such as the plaintiff was required to tender the entire purchase price (either all in cash or by way of a cash down payment and financing rider) without any notice in order to accept the sponsor’s offer, could effectively deprive him of his right to purchase the apartment at the “insider” price during the exclusive period.
This would not be in keeping with the legislative intent of the statutes cited herein which seek to protect tenants and prevent uncertainty, hardship and dislocation in connection with the conversion process. (L 1978, ch 544, § 1.)
Accordingly, it is the decision of this court that plaintiff is entitled to purchase the shares of stock allocated to his apartment 3-0 at 400 East 56th Street, New York, New York, and defendants are directed to sell the plaintiff the shares allocated to his apartment for the sum of $68,310. The payment of $68,310 is to be made within 30 days of the date of the settlement of this judgment as follows: Plaintiff shall tender to the defendants the sum of $13,310 by way of cash or good check and the balance of $55,000 by way of a mortgage commitment.